Good morning, your honors. Bo Sterling on behalf of defendant appellant Stacy Johnson. First of all, I want to thank you for letting me appear here today on behalf of Mario Valencia. I appreciate you accommodating him. He does remain lead counsel. He did draft the briefs. I promise I'm not going to spend a lot of time on the facts here, but we have a lot of issues. I do want to just take a moment to talk about the nature of the offense here. And in particular, to rebut the suggestion that this was a complex or sophisticated scheme to defraud the union. As the court's aware, Ms. Johnson worked for the union. She was a cashier. She accepted initiation fees and monthly dues fees from laborers that needed to belong to this union in order to work in Las Vegas. Because these were laborers, this was mostly cash transactions, I gather, from the record. And she was convicted of embezzling money and falsifying union records. Now, if you wanted to design a system that was better as an employer, a system that was better suited to having your employees steal money from you, it's hard to imagine anything better than this. She's dealing with cash. She's a cashier. She enters information from the money she receives, the $500 initiation fee when it's applicable, and three months of union dues at $90 total. She enters that information into the computer system, and then she prints a receipt for the laborer, which is supposed to reflect, of course, the amount of the money received. And then a screen pops up on the computer that says, in effect, and pardon my humor here, but in effect, do you want to tell the union that you are, now that you have the $590 in your hand, do you want to tell the union that you've actually collected a different amount than the receipt that you've given to the laborer? Because what the computer did is it did a pop-up that said, did it print correctly, the receipt? And if you say no, then it voids out that transaction, and you get to re-enter, in essence, whatever you want to enter with regard to how much money was accepted by the union and goes into the union account. So she's given a receipt to the laborer for the $590. It's alleged she pockets the $500. She says no, and then she gets that screen. And then, of course, she also has the administrative password, which everybody working there has. Well, what's your point? What's here? What do you want us to do? Okay, this is relevant for a few things. First of all, we have the two-level enhancements for sophisticated means. That should not have been applied. This was really just the kind of transaction she did every day in terms of its complexity as data entry cashier. It also goes to the first argument in the brief, which is whether the conviction is supported by substantial evidence. Now, I don't want to spend a lot of time getting bogged down in that. The brief addresses that. But that would get her sentence and conviction set aside. She got, what, a year and a day, counsel? A year and a day, Your Honor. On, what, $40,000 embezzlement? $46,000 alleged. It was really $6,000, according to the accounts that she was actually convicted of. That's a very long sentence for embezzling money from a union. Well, you would think so, Your Honor, especially if you're used to dealing with the drug cases and other cases where the sentences in federal court handed down tend to be quite long. But still, it's an important issue to her, and we want to make sure that the court got it right in this circumstance. You started off, and I think Judge Tashima asked you, what are we doing? Are we talking about, you know, a willing chicken getting plucked and you think it's okay? Or is that what you're saying, that this union was so dumb that they put this woman in there begging her to steal? No, here's the point, Your Honor, first of all. And the fact that she was in a position of trust does not, and they trusted her to do this, and she had to operate some computer things, and maybe the computer asked the wrong question. The point here is, first of all, we have the two-point enhancement for use of sophisticated means of accomplishing the crime. Two, we have her argument that the record doesn't support the conviction. And the importance of how simple this is, is that there were other people that worked also for the union as cashiers and as fill-in cashiers. They all seemed to use each other's access codes, three-digit number, interchangeably. Other people had access to the computers. In fact, of the hundred or so transactions that the union IT person identified, a handful of them, I think six or more, were done when Ms. Johnson wasn't even at work. So the point is, and the IT guy said that everybody swapped pins, they got onto each other's computers. There was, in essence, no security protocol in place to make sure that the union knew who was using the computer at what time. The case here is purely circumstantial. Obviously, you can have a conviction based on circumstantial evidence, but it does go to whether or not there is reasonable doubt in this case. And that reasonable doubt is created in a number of ways. Amongst those, the easy access to the means of the stealing the money from the union, and the multiple people using the computer, and the fact that this was often done, or at least on occasion done, when she wasn't there. Counsel, you've made two different arguments based on that same fact, and I'm still having a little hard time separating and trying to figure out where they go with them. So the first one goes to the question of the sufficiency of the evidence. So are you contesting the sufficiency? Do you want to make the sufficiency of the evidence argument here, or do you not want to make it? Oh, I don't want to spend a lot of time on it, Your Honor. It's an abreast. Because now you've told us that there were six transactions that weren't there when she was there, but there's tons of evidence that she was embezzling money. I mean, this really is not, it's really not a serious question.  Tell me what has to be complex or sophisticated and why this wasn't sophisticated, in that she was creating dummy receipts and pocketing things at different times. There were at least three different transactions she generally had to conduct with these folks. What is there in the law that suggests that this is not complex or sophisticated? That this is, one, really just part of the data entry function that she was performing anyway, filling information out on these receipts and updating the information using the evidence. Do we have any cases discussing what is complex or sophisticated? Oh, certainly, Your Honor. We don't have anything that's exactly along the lines here, but we do have the, you know, we have the Whalen case, that's the Seventh Circuit, but we've talked about in the briefing about what 2B1.1 of the sentencing guidelines requires. Well, what is there in the sentencing guidelines that suggests that this is not complex or sophisticated? That this is not something that's beyond the typical kind of embezzlement. This is standard. This is simply creating two sets of records, one for one person and one for somebody else. Now, is the sentencing guideline addressed specifically to embezzlement? They're not addressed specifically to the circumstances. It's addressed to what, to theft, the way that the theft is conducted? I'm sorry, Your Honor, I don't. Because, you know, if you work at 7-Eleven and you put your hand in the till and you take it and you stick it in your back pocket, there's nothing sophisticated about that. That would be both theft and it would be a form of embezzlement if you're an employee. Here she's using data entry. She is creating a backup document. So she's creating two sets of documents. So she's got a ghost document and a real document. She has pulled this off for some time without detection. I don't know how they missed this on their audits of the books, but they've missed this for, what, about three years. And that's one of the points that the government makes with regard to this argument is that this could have gone undetected forever if it hadn't come about as part of a different investigation. But that really just goes to the level of the lack of security protection in the system. When you talk about entering two sets of records, you have the first receipt that just gets kicked out into the printer, and then you simply hit no when it asks you if you want to keep that one, and then you just enter a different number that you want to tell the union was collected. I'd like to move on, if I may, Your Honor, because we have some other issues here that also touch on the same issue, or on the same with regard to the amount of loss and how that was determined by the court, and I certainly want to discuss that. The court in this instance, although she was only charged with a handful of these transactions, calculated the amount of loss based on the assumption that all of the fraudulent transactions or the embezzlement reflected in the documents, all of those that occurred when she was at work were done by her. And so the court simply subtracted the losses from the days she wasn't at work and attributed the rest to her, even though it's undisputed that other people were using her log-in information. And here we have... Excuse me. Did you already suggest that somebody else set up this scheme? Well, we do have allegations or charges against a second person. I understand that. This was her creation, was it not? That's not part of the argument, as I understand it, from the government. This is not a conspiracy, and that's not part of the charge. We simply have, and that's a big question, Your Honor, because, you know, when we're talking about related conduct, that's what we usually have, the circumstances where we have the conspiracy. And obviously the guidelines allow the court to look at related conduct, but here we have a series of separate transactions, which are similar in nature but not necessarily related. And the government wants to say this is all part of a common scheme or plan and so we should allow everything. But the common scheme or plan maybe would be if your intention was to hurt the union or if hurting the union was part of the crime, then all of these separate transactions might be considered related in that manner. But here it appears that the only intention was simply to steal the $500 on a lot of different occasions. And under those circumstances, the relevant conduct should be limited to the ones that are charged. The government also says that they're entitled under the guidelines or the court is to make a reasonable estimate of the damages, and that's certainly true. And the government says, well, some days she wasn't there, so we didn't attribute that to her. Other days when she was there, we attributed all of that to her. Perhaps some of it wasn't her, but it all kind of washes out in the end because there was probably more there than we actually charged her with or sentenced her based on. Happened on her watch, right? No, not necessarily that it happened on her watch. The government is saying that they may have listed instances when she wasn't responsible, but at the same time there were probably also instances where she was responsible that we haven't listed, and so let's not make a big deal about it. And I don't think that that's the rule. It's argued in the brief, so I don't want to go into it too much, but the McMillan v. Pennsylvania case and the whole notion of the tail wagging the dog and that sort of thing, this isn't the most egregious instance of that, but we do suggest that's the sort of thing going on. Now, I don't have a lot of time, but I do want to address the confession issue. I think it's a real important one here. The ex-husband talked to the labor investigator, said that the defendant had bragged to her about how she was stealing money from the union. Obviously very powerful evidence, very damaging evidence to her when heard by the jury. The problem is that when Joseph was called at trial, he said he didn't remember saying those things. So the government wants to get this confession in, and they call the labor investigator, who then comes in with hearsay testimony to supposedly impeach, being the only purpose, supposedly only to impeach the testimony of Joseph, the ex-husband, as to his memory. The defendant objected to that testimony. Objected to that testimony. The Court heard argument on it, made a ruling on it, had a hearing on it. Well, when the Court made a ruling, did it expressly do a 403 balancing analysis? Well, there was no request expressly for 403 balancing, Your Honor. The Court didn't do one. I don't think the Court did it. The record's just not clear on that. It's not on the record. That's correct, Your Honor. But we do have some clear errors of law here. We think the Court should address that issue under Crouch and Beshaw and not allow that sort of impeachment, both because of its highly prejudicial nature and because it's just improper under these circumstances. I'm going to try to reserve a little bit of time. I don't have much left unless the Court has any questions right now. Let me do so. Good morning. May it please the Court, I'm Elizabeth White for the United States. Good morning, Counsel. Taking these in order, the sophisticated means enhancement, I think the distinction that Your Honor made is a good one. Sophisticated means is a relative term, and when you're talking about theft or embezzlement, the unsophisticated way to do it is to reach in and take money out of the till and put it in your pocket and go home. This was a fairly complex way of doing it. I mean, it required overriding the computer system, sort of short-circuiting the transaction after you've given the union member the receipt so that they have a receipt that shows they paid $590, then kind of short-circuiting it, starting it over, so that the union has a receipt that says they only received 90, then going into the membership record and changing one of the 30s to 530 so that nobody can tell the difference when someone goes to check the membership record. In response to your question, Judge Stafford, I believe it was one other cashier and one of the dispatchers were also charged, and they pleaded guilty to doing this. This wasn't charged as a conspiracy, but it does appear that there were three people who were doing this. And it seemed like there were some other things going on that weren't part of this record because of the way the investigation and the way this was discovered was part of an investigation into a different problem with the way cashiers were rating or sort of characterizing the union members when they entered them into the system. But in terms of sophisticated means, and I apologize that it was late. I think it was last Thursday I sent that 28-J letter about this Court's recent decision in Jennings. And what Jennings says is the sophisticated means guideline gives a couple of examples, but there's nothing that says that the complex scheme needs to be as sophisticated as those examples, which is about offshore bank accounts and that kind of thing, in order to qualify as the sophisticated means. This was, as you say, Your Honor, the kind of scheme, it was a multi-step scheme that allowed this defendant to avoid detection for a very long time. Turning to the loss calculation, there were a couple of ways. And I want to say, first of all, at sentencing, the defendant's objection to the loss calculation amount at sentencing was that the union had insurance, and so therefore there was no loss. And the district court correctly overruled that objection and cited the statute that says just because the victim has insurance, that doesn't, I mean, that is just not how you calculate this. So the district court correctly overruled the objection that the defendant did make. And then when the judge said, now, do you have anything in terms of whether it's $46,000 or $53,000, my finding on that, because for guideline purposes, anything from $30,000 to $70,000 is the same six-level enhancement. And defense counsel said, no, Your Honor, I've got nothing to add on that. So this is not something that the government was asked to provide more evidence about at the sentencing hearing. But we had a couple of ways of calculating it. One is there were about 100 comparing timesheets with the receipts and the cashier audit reports. There were about 106 of these $500 thefts or $500 embezzlements that occurred under Ms. Johnson's login code at a time when Ms. Johnson was working. Yes, there were a couple, and actually two of the counts of conviction were counts where she was logged in under someone else's code. So it did happen sometimes that cashiers would do things under each other's codes. But that was one way of estimating, and, of course, under the guidelines a reasonable approximation is sufficient. And then the other point of that is that there were, I believe it was, $46,000 of unexplained cash deposits into her bank account over the course of this conduct. And these were $500, $1,000, $1,500 cash deposits on sort of a fairly regular basis, several of which were sort of the same day as these charged accounts. Is this before you admitted error on the reimbursement? Restitution, yes. And the government did concede for two reasons. First of all, this, what is this, Title 29? I mean, whenever we don't really do a whole lot of cases, judges or attorneys on cases under Title 29, and I think it just escaped everyone that the two restitution statutes that we usually use, 3663 and 3663A, don't apply to Title 29. And so that does need to go back. Of course, restitution can be ordered as a condition of supervised release or as a condition of probation. But then the second error is under these restitution statutes, the restitution is limited to the counts of conviction. And since she was only convicted of 12 counts, there is a limit of $6,000. And on remand, we will be asking, they can object, obviously. We'll sort that out in the district court. But we will be asking for the court to impose $6,000 restitution as a condition of supervised. Was there a case in the district court? No, no, I didn't. I just do appeals. So with respect to the loss calculation, whether you use the $106,500 embezzlement under her user ID while she was working as an approximation, or you use the $46,000 of unexplained cash deposits in those little small increments into her bank account, regardless, as I say, the court really just needs to make an approximation. I think one of the things that happened, the district court was talking about loss amount and restitution sort of as one thing and didn't separate out those two inquiries, and nobody caught that. That was kind of treated as a similar thing, and obviously those are two distinct things that should have been dealt with differently. So we do agree that that needs to go back. That is restitution. Sufficiency of evidence, I'll talk about it if you want, but, I mean, we had testimony from live witnesses. We had boatloads of records, receipts under, you know, that she had given that don't match the receipts in the union records. We have, you know, on four of the 12 counts that she was convicted of, on four of those times she was the only cashier working. I think that Mr. Sterling said something about that there was testimony that the cashiers swapped passwords, and that's not entirely accurate. There was no testimony that they swapped passwords. The question was, the question to the witness was, did the cashiers know each other's passwords? And the answer was, well, yeah, probably. I mean, they weren't that closely. It was a three-number password, and they weren't closely held secrets. And the other thing, and I think what would happen more often, I don't think there was any testimony of someone logging in with somebody else's password. But if a cashier was logged in and then stepped away and someone else came up, one of the dispatchers might come over to help that person and forget to log out and log in as themselves. They just kind of do it on the one that was logged in. So I think on those couple of occasions, that's probably what happened. But there was direct testimony that every cashier was responsible for the money in her cash drawer, and if there was a dollar missing at the end of the day, it came out of her pocket. So each cashier obviously had an incentive to keep track of what was going on with their own cash. I think with respect to Alan Weiss's testimony about the ex-husband's conversation with the defendant, on appeal, in the brief, the defendant actually makes a fairly good argument that there's a risk of unfair prejudice here and that the probative value of this testimony as impeachment was fairly small, given the ex-husband's testimony. And I will say, he didn't just say he didn't remember. He said, she did not say that. Did she tell you that she was stealing money from the union? No, she did not say that. And then he was asked about his interview with the investigator. He said, the investigator asked me about what I knew about money, and the question was, what did you tell him? And he said, I said, I don't know nothing about no money. And that was directly, I mean, those are declarative statements that directly contradict what happened. That said, the value, I mean, the need sort of, you know, the probative value of that testimony is impeachment. You know, there's a risk of unfair prejudice when you're talking about putting in a statement about a confession. And the judge gave a limiting instruction at the time, gave another limiting instruction in the jury instructions. But even so, I can understand. Kennedy. I seem to not favor allowing that kind of impeachment testimony, don't I? I think that that's true. I mean, I think that there's that sort of confessions are in their own little separate space, because even with the curative instruction, right? I think the issue here is, is that there was no 403 objection made in the district court. The only objection that the defendant. Kennedy. Does the defendant have to make that in order for the trial judge to have the obligation to do that balancing? No. Well, you could say the trial judge should have done it, but on appeal, you know, when it comes to 403, we're in the plain error territory. Because the objection that the defendant made below is that a party can't impeach its own witness with extrinsic evidence in the form of live testimony. And that's just not the rule. And so, again, the district court correctly overruled the objection the defendant did make. You're not conceding that the judge has to do the rubric on the record. I have also taken into account rule evidence 403. No. Intellectually does that. Yes. No. And certainly in terms of putting stuff on the record, that is not necessary without an objection. I think both of the cases that the defendant cites in their opening brief, Verdusco and Sangre, in both of those cases, this Court says, you know, the defendant raised the prejudice issue in pretrial, at trial, whatever. And so then the question was, did the judge take it into account? And in both of those cases, that was raised. I mean, here, there was this objection made that a party is not permitted to impeach its own witness with extrinsic evidence in the form of live testimony. That was the objection. Well, that's not the rule. And so the judge said, your objection is overruled, and then we went on with things. And even in ---- That's done in camera first? No. No. What happened was the ex-husband testified. I mean, outside the presence of the jury. Yes. And then outside the presence of the jury, we called Mr. Weiss, who was the investigator who interviewed Mr. Joseph, called him as a rebuttal witness. Defense counsel said, wait a second, he's not on the witness list. We said, well, we didn't know we were going to need him until Mr. Joseph got up and testified inconsistently with his interview. So the judge sent the jury home, heard some conversation about it. The next day, heard some more, heard another objection about it, again, along those same lines, and then permitted the testimony, giving and asked defense counsel in terms of ---- I think it's, she said, I think it's admissible as impeachment. Do you want me to give the limiting instruction now or with jury instructions? Defense counsel said, I'd like you to do it both. So she did. And it was exactly the limiting instruction that the judge is supposed to give for impeachment testimony. So, you know, so now here we are on appeal saying, well, if that, you know, if that shouldn't have been admitted, did it, you know, did it affect the, did it affect the verdict? And then you go, you know, to answer that inquiry, you go right back to the sufficiency of the evidence. And as you say, Your Honor, there's boatloads of evidence that this defendant committed this crime. So under the, to the extent that we're talking about 403 under a plain error standard of review, or frankly, probably even under a harmless error standard of review, this is not reversible error. That's what, in Crouch, which is one of the cases that the defendant relies on, that was a case where the government actually knew that the witness was going to deny having made statements, because she said, I mean, in the pretrial interview she said, don't put me on the stand, because I'm telling you right now I'm going to deny ever saying this stuff. So they put her on the stand, got her to deny saying the stuff, so that they could call the police officer who interviewed and get the statements in that way. And what Crouch said is that even though the defendant in that case, the government knew that the defendant was going to, was going to deny making the statements and the judge gave no limiting instruction whatsoever, it was still in Crouch not given the weight of the other evidence against the defendant. And so that's where we stand here. And the other, just very briefly, Bershaw, and I'm sorry I didn't catch this when I was doing my answering brief, but the defendant relies on Bershaw. That case is from 1965, and it precedes the adoption of Rule 607. It suggests limitations on impeachment evidence. And I did say in our answering brief, I cited the 1995 case from this court that says there are no limitations other than foundation and relevance in terms of impeachment evidence. So to the extent that the common law before Rule 607 had put some kind of other limits on impeachment or impeaching your own witness stuff, Rule 607 really did away with that. And this Court actually recognized in Crouch, which the defendant cites in his brief and I think I do as well, Crouch cites Bushnaw and notes that that case is from before the adoption of Rule 607. I'm wondering if it's in the record or not. But before you, this witness went on the stand as a government witness, right? Yes. Was there any tip on the, before you put him on the stand in the witness room, that he was going to turn on you or anything like that?  Well, we knew he didn't want to be there. I mean, he was there under subpoena. Right. And we knew he didn't want to be there. And we cite the Fifth Circuit case in our brief that says that a defendant's reluctance to testify doesn't mean that you should be on notice that they're going to commit perjury once they get called to the stand. I mean, a defendant. You mean witness. I mean, I'm sorry. Yes, thank you.  they're reluctant to testify against friends and relatives. And so, but we, without more, reluctance to testify isn't enough that the government should expect that when that witness gets into the chair and takes the oath to tell the truth, that they're not going to do that. So, and that's in the Fifth Circuit case. I'm sorry the name escapes me from the moment, but we talk about it in our brief as well. Unless the Court has any questions. No. Thank you, counsel. Thank you so much. Mr. Starling, I think you've reserved a minute. Thank you, Your Honor. First of all, with regard to the 403 issue, there was no objection to that. We did argue in the briefs that the rule against impeaching your own evidence is essentially a 403 argument. We incorporated it in that way. We do think it's a clear error analysis. The government hasn't met its burden here, which is to show surprise and damage from the witness recanting the statement. As counsel, for the government just acknowledged, they knew that this witness was only there by subpoena and that he did not want to testify. The government also says, somewhat perhaps contradictorily, that his evidence was not important because the evidence was overwhelming in this case. At the same time, they say that the recanting was so important that they needed to impeach it. We would suggest that the testimony under the clearly erroneous standard or plain error standard is met here and that she should get a new trial on that basis. The amount of loss in terms of substituting the amount of gain based on the bank accounts, the deposits, that is an alternative that's allowed under the sentencing guidelines under 2B1.1. If you read the application note, I think it's number three. But that is an alternative that's only available if you can't reasonably calculate the amount of loss. But here we would suggest the amount of loss can easily be calculated because we know that each transaction was for $500. I think that's all I need to say, Your Honor, unless you have any questions. My time's up. Thank you. Thank both counsel for the argument. Assets v. Johnson is submitted.
judges: Stafford, Tashima, Bybee